<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| DINORAH ROVECCIO, | Case No.:  2:17-cv-03897 (PAZ) |
| Plaintiff, | **OPINION** |
| v. | |
| NANCY A. BERRYHILL, | |
| Defendant. | |

**APPEARANCES:**

SHERYL GANDEL MAZUR
195 FAIRFIELD AVENUE, SUITE C
WEST CALDWELL, NJ  07006
    On behalf of Plaintiff

ELIZABETH A. CORRITORE
SPECIAL ASSISTANT U.S. ATTORNEY
C/O SOCIAL SECURITY ADMINISTRATION
OFFICE OF GENERAL COUNSEL
300 SPRING GARDEN STREET, SIXTH FLOOR
PHILADELPHIA, PA 19123
    On behalf of Defendant

**PAUL A. ZOSS, United States Magistrate Judge.**

This matter comes before the Court pursuant to Section 205(g) of the Social Security Act,

as amended, 42 U.S.C. § 405(g), regarding the application of Plaintiff Dinorah Roveccio for

Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (42 U.S.C. §§ 401,

et seq.).  Plaintiff appeals from the final decision of the Administrative Law Judge ("ALJ") denying

the application; Defendant, the Commissioner of Social Security ("the Commissioner"), opposes

Plaintiff's appeal.[1]  After careful consideration of the record, including the ALJ hearing transcripts, the ALJ's decision, and the pleadings and memoranda of the parties, the Court decides this matter pursuant to Rule 78(b) of the Federal Rules of Civil Procedure and Local Civil Rule 9.1(f).  For the reasons set forth below, the Court reverses the Commissioner's decision that Plaintiff was not disabled and remands the case in accordance with the following instructions.

## I.    PROCEDURAL HISTORY

On August 9, 2013, Plaintiff filed an application for DIB alleging a disability onset date of March 19, 2013.  (R. 158-61.)[2]  On October 4, 2013, the Commissioner determined that Plaintiff was not disabled and denied the application.  (R. 84.)  Plaintiff filed for reconsideration, and the application was again denied on February 19, 2014.  (R. 95.)  On September 17, 2015, an Administrative Law Judge held a hearing on Plaintiff's application at which Plaintiff was represented by counsel.  (R. 35-83.)  During the hearing, Plaintiff amended the alleged onset date to June 13, 2013.  On October 19, 2015, the ALJ issued a decision denying Plaintiff's application.  (R. 13-29.)  On April 6, 2017, the Appeals Council denied Plaintiff's request for review (R. 1-6), thereby affirming the ALJ's decision as the "final" decision of the Commissioner.

On May 31, 2017, Plaintiff timely filed this appeal pursuant to 42 U.S.C. § 405(g) and pursuant to 42 U.S.C. § 1383(c)(3).  ECF No. 1.  On May 1, 2018, Plaintiff consented to have a

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social Security.  On March 6, 2018, the Government Accountability Office stated that, as of November 17, 2017, Ms. Berryhill's status violated the Federal Vacancies Reform Act, which limits the time a position can be filled by an acting official and "[t]herefore Ms. Berryhill was not authorized to continue serving using the title of Acting Commissioner[.]"  *Violation of the Time Limit Imposed by the Federal Vacancies Reform Act of 1988 Commissioner*, Social Security Administration, Government Accountability Office (Mar. 6, 2018).  However, Ms. Berryhill continues to functionally lead the Social Security Administration from her position of record as Deputy Commissioner of Operations.  Pursuant to Federal Rule of Civil Procedure 25(d), Nancy A. Berryhill is substituted as the defendant in this suit.

[2] "R." refers to the continuous pagination of the administrative record.  ECF No. 6.

U.S. Magistrate Judge conduct all further proceedings in the case to disposition pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure.  ECF No. 15.[3]  The case was reassigned to the undersigned Magistrate Judge on December 21, 2018.

## II.    LEGAL STANDARD

### A.    Standard of Review

This Court has the authority to conduct a plenary review of legal issues decided by the ALJ in reviewing applications for DIB.  *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  In contrast, the Court reviews the ALJ's factual findings to determine if they are supported by substantial evidence.  *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000); *see also* 42 U.S.C. §§ 405(g) & 1383(c)(3).  Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citation and internal quotations omitted); *see K.K. ex rel. K.S. v. Comm'r of Soc. Sec.*, No. 17-2309 (JLL), 2018 WL 1509091, at *4 (D.N.J. Mar. 27, 2018).  Thus, substantial evidence is "less than a preponderance of the evidence, but 'more than a mere scintilla.'" *Bailey v. Comm'r of Soc. Sec.*, 354 F. App'x 613, 616 (3d Cir. 2009) (citations and quotations omitted); *see K.K.*, 2018 WL 1509091, at *4.

The substantial evidence standard is a deferential one, and the ALJ's decision cannot be set aside merely because the Court "acting de novo might have reached a different conclusion." *Hunter Douglas, Inc. v. NLRB*, 804 F.2d 808, 812 (3d Cir. 1986); *see, e.g., Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry

---

[3] Defendant has provided general consent to Magistrate Judge jurisdiction in cases seeking review of the Commissioner's decision.  *See* Standing Order In re: Social Security Pilot Project (D.N.J. Apr. 2, 2018).

differently.") (citing *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999)); *K.K.*, 2018 WL 1509091, at *4 ("'[T]he district court ... is [not] empowered to weigh the evidence or substitute its conclusions for those of the fact-finder.'") (quoting *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992)).

Nevertheless, the Third Circuit cautions that this standard of review is not "a talismanic or self-executing formula for adjudication." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983) ("The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham."); *see Coleman v. Comm'r of Soc. Sec.*, No. 15-6484 (RBK), 2016 WL 4212102, at *3 (D.N.J. Aug. 9, 2016). The Court has a duty to "review the evidence in its totality" and "take into account whatever in the record fairly detracts from its weight." *K.K.*, 2018 WL 1509091, at *4 (quoting *Schonewolf v. Callahan*, 972 F. Supp. 277, 284 (D.N.J. 1997) (citations and quotations omitted)); *see Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir. 1981) (substantial evidence exists only "in relationship to all the other evidence in the record"). Evidence is not substantial if "it is overwhelmed by other evidence," "really constitutes not evidence but mere conclusion," or "ignores, or fails to resolve, a conflict created by countervailing evidence." *Wallace v. Sec'y of Health & Human Servs.*, 722 F.2d 1150, 1153 (3d Cir. 1983) (citing *Kent*, 710 F.2d at 114); *see K.K.*, 2018 WL 1509091, at *4. The ALJ decision thus must be set aside if it "did not take into account the entire record or failed to resolve an evidentiary conflict." *Coleman*, 2016 WL 4212102 at *3 (citing *Schonewolf*, 972 F. Supp. at 284-85) (citing *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978))).

Although the ALJ is not required "to use particular language or adhere to a particular format in conducting [the] analysis," the decision must contain "sufficient development of the record and explanation of findings to permit meaningful review." *Jones v. Barnhart*, 364 F.3d

501, 505 (3d Cir. 2004) (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119 (3d Cir. 2000));

*see K.K.*, 2018 WL 1509091, at *4.  The Court "need[s] from the ALJ not only an expression of

the evidence s/he considered which supports the result, but also some indication of the evidence

which was rejected." *Cotter*, 642 F.2d at 705-06; *see Burnett*, 220 F.3d at 121 ("Although the ALJ

may weigh the credibility of the evidence, [s/]he must give some indication of the evidence which

[s/]he rejects and [the] reason(s) for discounting such evidence.") (citing *Plummer v. Apfel*, 186

F.3d 422, 429 (3d. Cir. 1999)).  "[T]he ALJ is not required to supply a comprehensive explanation

for the rejection of evidence; in most cases, a sentence or short paragraph would probably suffice."

*Cotter*, 650 F.2d at 482.  Absent such articulation, the Court "cannot tell if significant probative

evidence was not credited or simply ignored." *Id.* at 705.  As the Third Circuit explains:

> Unless the [ALJ] has analyzed all evidence and has sufficiently explained the
> weight [s/]he has given to obviously probative exhibits, to say that [the] decision is
> supported by substantial evidence approaches an abdication of the court's duty to
> scrutinize the record as a whole to determine whether the conclusions reached are
> rational.

*Gober*, 574 F.2d at 776; *see Schonewolf*, 972 F. Supp. at 284-85.

Following review of the entire record on appeal from a denial of benefits, the Court can

enter "a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or

without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  Remand is appropriate if the

record is incomplete or if the ALJ's decision lacks adequate reasoning or contains illogical or

contradictory findings.  *See Burnett*, 220 F.3d at 119-20; *Podedworny v. Harris*, 745 F.2d 210,

221-22 (3d Cir. 1984)).  Remand is also appropriate if the ALJ's findings are not the product of a

complete review which "explicitly weigh[s] all relevant, probative and available evidence" in the

record.  *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994) (internal quotation marks omitted); *see*

*A.B. on Behalf of Y.F. v. Colvin*, 166 F. Supp.3d 512, 518 (D.N.J. 2016).  A decision to "award

benefits should be made only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits." *Podedworny*, 745 F.2d at 221-22 (citation and quotation omitted); *see A.B.*, 166 F. Supp.3d at 518.  In assessing whether the record is fully developed to support an award of benefits, courts take a more liberal approach when the claimant has already faced long processing delays.  *See*, *e.g.*, *Morales v. Apfel*, 225 F.3d 310, 320 (3d Cir. 2000).  An award is "especially appropriate when "further administrative proceedings would simply prolong [Plaintiff's] waiting and delay his ultimate receipt of benefits."  *Podedworny*, 745 F.2d at 223; *see Schonewolf*, 972 F. Supp. at 290.

### B.    Standard for Awarding Benefits

Under the Social Security Act, an adult claimant (i.e., a person over the age of eighteen) is disabled and eligible for DIB based on an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  20 C.F.R. § 404.1505(a).  An impairment is "medically determinable" if it results from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques.  Thus, an impairment can be established by objective medical evidence from an acceptable medical source, but cannot be established by a statement of symptoms, a diagnosis, or a medical opinion.  *Id.* § 404.1521.

The process for determining an adult's claim for DIB involves a five-step sequential inquiry.  20 C.F.R. § 404.1520(a)(4).[4]  The claimant bears the burden of proof at Steps One through

---

[4] This case arises from a claim filed before March 27, 2017 and is therefore analyzed by this Court – as it was by the ALJ – under 20 C.F.R. § 404.1527.

Four.  At Step Five, the burden shifts to the Commissioner.  *Id.* § 404.1512; *see Holley v. Colvin*, 975 F. Supp.2d 467, 476-77 (D.N.J. 2013), *aff'd sub nom. Holley v. Comm'r of Soc. Sec.*, 590 F. App'x 167 (3d Cir. 2014).  At each Step, the ALJ must consider the combined effect of all the claimant's physical and mental impairments without regard to whether any single impairment, if considered separately, would be of sufficient severity to proceed to the next Step.  20 C.F.R. § 404.1523(c).

At Step One, the ALJ decides whether the claimant is currently engaging in substantial gainful activity.  20 C.F.R. § 404.1520(b).  Substantial gainful activity is work activity that involves doing significant physical or mental activities and is usually done for pay or profit.  *Id.* §§ 404.1572(a) & (b).  If the claimant is engaging in such activity, then the inquiry ends because the claimant is not disabled.

"The [Step Two] inquiry is a de minimis screening device to dispose of groundless claims." *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 546 (3d Cir. 2003).  At this step, the ALJ decides whether the claimant has an impairment or a combination of such impairments that is severe.  20 C.F.R. § 404.1520(c).  An impairment or combination of impairments is severe if it significantly limits a claimant's ability to perform basic work activities.  An impairment or combination of impairments is not severe if the claimant has a slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations.  *Id.* § 404.1522.  If the claimant does not have a severe impairment or combination of impairments, then the inquiry ends because the claimant is not disabled.

At Step Three, the ALJ decides whether the claimant's impairment or combination of impairments "meets" or "medically equals" the severity of an impairment(s) in the Listing of Impairments ("Listing") found at 20 C.F.R. § 404, Subpart P, Appendix 1.  20 C.F.R.

§§ 404.1520(d), 404.1525, 404.1526. If the claimant's specific impairment is not listed, the ALJ will consider the most closely analogous listed impairment for purposes of deciding medical equivalence. *Id*. § 404.1526(b)(2). If the claimant has an impairment or combination of impairments that meets or medically equals a Listing, then the claimant is presumed to be disabled if the impairment or combination of impairments has lasted or is expected to last for a continuous period of at least 12 months. *Id*. § 404.1509.

At Step Four, the ALJ must determine the claimant's residual functional capacity ("RFC"), determine the physical and mental demands of the claimant's past relevant work, and determine whether claimant has the level of capability needed to perform past relevant work. 20 C.F.R. §§ 404.1520(e) & (f). RFC is the claimant's maximum remaining ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. Past relevant work is work performed (either as the claimant actually performed it or as it is generally performed in the national economy) either within the last 15 years or within 15 years prior to the disability date. In addition, the work must have lasted long enough for the claimant to learn to do the job and be engaged in substantial gainful activity. *Id*. §§ 404.1560, 404.1565. If the claimant's RFC enables her/him to perform past relevant work, then the claimant is not disabled.

At Step Five, the ALJ must decide whether the claimant, considering her/his RFC, age, education, and work experience, can perform other jobs that exist in significant numbers in the national economy. 20 C.F.R. § 404.1520(g). If the claimant is incapable of doing so, then s/he is presumed to be disabled if her/his impairment or combination of impairments has lasted or is expected to last for a continuous period of at least twelve months.

In deciding the claimant's ability to perform other jobs that exist in significant numbers in the national economy, the ALJ must consider whether the claimant's impairment and symptoms

result in exertional and/or non-exertional limitations. The classification of a limitation as exertional is related to the United States Department of Labor's classification of jobs by various exertion levels (sedentary, light, medium, heavy, and very heavy) in terms of the strength demands for sitting, standing, walking, lifting, carrying, pushing, and pulling. 20 C.F.R. §§ 404.1569a(a) & (b). Non-exertional limitations affect a claimant's ability to meet all other demands of a job (i.e., non-strength demands), including but not limited to difficulty performing the manipulative or postural functions of some work such as reaching, handling, stooping, climbing, crawling, or crouching. *Id*. § 404.1569a(c).

If the claimant has no non-exertional limitations and can perform all or substantially all exertion demands at a given level, then the ALJ must use the Medical-Vocational Rules (also referred to as "Grid Rules") found at 20 C.F.R. § 404, Subpart P, Appendix 2. 20 C.F.R. § 404.1569a(b). The Grid Rules reflect various combinations of RFC, age, education, and work experience and direct a finding of disabled or not disabled for each combination. If the claimant also has any non-exertional limitations or cannot perform substantially all the exertional demands at a given level, then the Grid Rules are used as a framework for decision-making unless there is a rule that directs a conclusion of disabled without considering the additional non-exertional or exertional limitations. *Id*. § 404.1569a(d). If the claimant has solely non-exertional limitations, then the Grid Rules provide a framework for decision-making. *Id*. § 404.1569a(c).

## III.    ALJ DECISION AND APPELLATE ISSUES

Plaintiff was fifty-one years old on the amended alleged onset date (June 13, 2013) and last met the insured status requirements of the Social Security Act on December 31, 2017. (R. 18, 158.) At Step One, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the amended alleged onset date. (R. 18.) At Step Two, the ALJ found that Plaintiff had the

following severe impairments:  spinal degenerative disc disease, and fibromyalgia and associated

disorders. (R. 18.)  At Step Three, the ALJ found that Plaintiff did not have an impairment or

combination of impairments that meets or medically equals the severity of Listing 1.02 (Major

dysfunction of a joint(s)) or Listing 1.04 (Disorders of the spine).  (R. 18.)  At Step Four, the ALJ

found that Plaintiff had the residual functional capacity to perform light work

> except that she can lift and carry 10 pounds frequently and 20 pounds occasionally;
> stand/walk 4 hours in an 8 hour workday; sit 6 hours in an 8 hour workday;
> occasional postural maneuvers; but no climbing ladders/ropes/scaffolds; frequent
> bilateral reaching in all directions and overhead; 25% head turning to each side;
> frequent fine fingering and gross handling; no working around dangerous
> machinery or unprotected heights; and she would be off task 15% of the time.

(R. 19.)  The ALJ also found at Step Four that Plaintiff was able to perform her past relevant work

as an administrative assistant.  (R. 23.)  The ALJ concluded that Plaintiff was not disabled at any

time between the amended alleged onset date and the decision date (October 19, 2015).  (R. 23.)

Plaintiff's appeal is multi-pronged.  First, Plaintiff contends that the ALJ's decision should

be remanded under 42 U.S.C. § 405(g) pursuant to Sentence Four because the ALJ committed

reversible error by:  (1) failing to consider and include in the record written statements from

Plaintiff's husband and daughter that were submitted prior to the hearing date; (2) failing to explain

why Plaintiff's impairments were not of Listing level severity; (3) failing to follow the treating

physician rule in evaluating the medical evidence; (4) discrediting Plaintiff's subjective symptoms,

including pain; (5) failing to include all of Plaintiff's credibly established limitations in the RFC

finding; and (6) finding that Plaintiff was able to perform her past relevant work.  Second, Plaintiff

contends that even if the case is not reversed under Sentence Four, "it should at the least be

remanded pursuant to [Sentence Six]" based on additional evidence that was not before the ALJ.

ECF No. 24 at 12.  Third, Plaintiff contends that "[a] dual basis remand is also appropriate[.]"  *Id*.

Defendant contends that the ALJ's decision should be affirmed in its entirety because it correctly

applied the governing legal standards, reflected consideration of the entire record, and was supported by sufficient explanation and substantial evidence.

## IV.     SUMMARY OF EVIDENCE.

### A.     <u>Submitted Before Hearing.</u>

#### 1.     Medical Evidence.

In March 2013, Plaintiff was treated by Kimberly A. VanPelt (physician assistant) with Garden State Orthopaedic Associates for neck pain that radiated into her right arm.  Plaintiff stated that the pain was particularly severe when she was at work and using a computer.  Physical examination findings included right-sided muscular tenderness of the cervical spine and pain with forward flexion and extension of the spine.  Ms. VanPelt ordered cervical spine x-rays that revealed straightening of the lordotic curvature consistent with muscle spasm and disc space narrowing at C5-C6 and C6-C7, with posterior and anterior osteophyte formation.  She diagnosed cervical radiculopathy with cervicalgia and prescribed Prednisone and physical therapy.

During an April 2013 follow-up with Ms. VanPelt, Plaintiff stated that she still experienced pain.  Physical examination findings were the same as the prior visit.  Ms. VanPelt diagnosed cervical radiculopathy with cervicalgia and prescribed Diclofenac and physical therapy.  During a follow-up two weeks later, Plaintiff stated that she still experienced pain, and physical examination findings were the same as the prior visit, with the addition of decreased sensation in the upper right arm.  Ms. VanPelt reviewed a cervical spine MRI dated April 3, 2013 that revealed:  a small left paracentral disc herniation at C3-C4 with impression upon the anterior subarachnoid space; a moderate to large central herniated disc at C4-C5 with impression upon the spinal cord causing mild central spinal canal stenosis; a moderate-sized broad-based disk herniation at C5-C6 with osteophytic ridge complex pressing upon the anterior subarachnoid space and causing mild central spinal canal stenosis and with moderate narrowing of the left neural foramen; and a mild to

moderate broad-based disk herniation and disk ridge complex at C6-C7 with impression upon the anterior subarachnoid space causing mild central spinal canal stenosis with mild narrowing of both neural foramina, right worse than left with possible right C7 nerve root impingement. Ms. VanPelt diagnosed cervical radiculopathy with cervical herniated discs at multiple levels and recommended an epidural injection. Plaintiff stated that she wished to "hold off" on the injection. Ms. VanPelt prescribed Diclofenac and physical therapy; she also instructed Plaintiff to remain out of work for the next four weeks.

In a May 2013 follow-up with Ms. VanPelt, Plaintiff stated that she continued to experience pain, especially when using a computer. Physical examination of the cervical spine revealed right-sided paraspinal muscular tenderness, in addition to pain with forward flexion and rotation to the right. Ms. VanPelt recommended that Plaintiff have an epidural injection and remain out of work for another four weeks. Ms. VanPelt advised Plaintiff that she may need a series of three injections. (R. 256-67.) Also in May 2013, Plaintiff was evaluated for shoulder and upper extremity pain by Dr. Fani Thomson (pain management) on referral from Dr. VanPelt. Physical examination findings included: normal muscle testing in the upper extremities; sensation in tact to light touch in upper extremities; reflexes 2+ at biceps, triceps and brachial radialis bilaterally; positive Spurling test bilaterally; normal range of shoulder motion; a lot of tenderness in the cervical paraspinal musculature; and multiple trigger points in the trapezius. Dr. Thomson diagnosed cervical radiculopathy and cervicalgia. Plaintiff was hesitant to have a cervical epidural steroid injection and wanted to try all conservative measures first. Dr. Thomson prescribed a Medrol dose pack.

In a June 2013 follow-up with Dr. Thomson, Plaintiff stated that she had a slight reduction in pain, but only on the right side. Physical examination findings and diagnoses were the same as

the prior visit.  Dr. Thomson scheduled a cervical epidural steroid injection for June 12, prescribed Vicodin, and instructed Plaintiff to remain out of work until June 17.  (R. 275-84.)  Also in June 2013, Dr. Marcia Gonzalez (internal medicine) prepared a medical note advising that Plaintiff was being treated for back pain and was unable to return to work until July 16.  (R. 396.)  Dr. Gonzalez referred Plaintiff for more diagnostic imaging.  A thoracic spine x-ray dated June 20, 2013 revealed mild diffuse degenerative spurring.  A thoracic spine MRI also dated June 20, 2013 revealed no spondylolisthesis; T2 hyperintense lesion in left T10 pedicle most likely representing a benign hemangioma; and mild diffuse degenerative disc disease with no disc herniation or stenosis.  (R. 364-65.)  Dr. Gonzalez's handwritten treatment notes from July 12 and August 23, 2013 are illegible.  (R. 398-99.)

In August 2013, Plaintiff was evaluated by Dr. James C. Natalicchio (pain management) for severe neck and bilateral parascapular pain.  Plaintiff stated that she had never undergone injection therapy.  Physical examination findings included:  forward flexed neck with protracted shoulders; cervical spine range of motion restricted most prominently to extension, with limited flexion; Hoffman sign negative on right and equivocal on left; subjectively diminished senses to the tip of the right thumb and index finger; and distal upper extremity vascular examination notable for 2 post palpable pulses.  Dr. Natalicchio diagnosed chronic neck and parascapular pain caused by multilevel cervical disc displacement and central and neural foraminal stenosis (with findings most pronounced from C3-C7, and central canal compromise noted at C4-C5 with deformation of the ventral aspect of the spinal cord).  He recommended that Plaintiff obtain a surgical consultation for further evaluation and a physical therapy regimen including a trial of cervical traction.  His treatment notes indicate that epidural steroid injection therapy was discussed and deferred.  Dr.

Natalicchio also diagnosed rotator cuff syndrome and cervical neuritis for which he prescribed physical therapy.  (R. 368-80.)

On August 23, 2013 (as she had on June 18 and July 12, 2013), Dr. Gonzalez completed a disability form for Plaintiff's private insurer.  Dr. Gonzalez opined that Plaintiff could not sit more than 4 hours; could not stand more than 4 hours; could never reach, finger, or handle with her right arm; could occasionally reach, finger, or handle with her left harm; could never lift/carry any weight in her right arm; was unable to raise her right arm more than 30 degrees; and could frequently lift/carry up to 10 pounds with her left arm.  (R. 388-89, 400-01.)  On August 27, 2013, Dr. Gonzalez completed a General Medical Report opining that Plaintiff had unspecified limitations with lifting, pushing, and pulling but no limitations with sitting, standing or walking.  Dr. Gonzalez also referred to Plaintiff's records and opined that Plaintiff had "other" unspecified limitations.  (R. 385-87.)

In October 2013, State Agency reviewing consultants initially opined that Plaintiff was capable of the "full range of light" work.  She could frequently lift up to 10 pounds; occasionally lift up to 20 pounds; stand and/or walk for a total of 6 hours in an 8-hour day; and sit with normal breaks for a total of 6 hours in an 8-hour day.  She could occasionally climb ramps, stairs, ladders, ropes, or scaffolds; could occasionally crawl; and had no restrictions in balancing, stooping, kneeling, or crouching.  She could occasionally reach in front, laterally, or overhead with either or both arms.  Her handling, fingering, and feeling abilities were unrestricted.  (R. 85-94.)

In early December 2013, Plaintiff was evaluated by Dr. Richard Kang (pain management).  Physical examination findings were normal except for:  straightening of the normal cervical lordosis; multiple trigger points in the medial aspect of bilateral scapula, supra and infraspinatus, and thoracic paraspinal musculature area; bilateral positive cervical facet loading; mildly positive

right Spurling's; positive right straight leg raise; antalgic gait favoring the right lower extremity; and mild decreased reflexes in the right patella. Dr. Kang opined that Plaintiff's pain complaints may be related to disc herniation, and he also opined that Plaintiff had a significant amount of superimposed myofascial pain that was "very consistent with [a] diagnosis of cervical thoracic facet arthropathy for which the patient has been complaining of headaches." He recommended that Plaintiff continue with physical therapy and/or chiropractic treatment, and he prescribed Ultram, Lyrica, and Flexeril. In mid-December 2013, a lumbar spine MRI revealed: disc bulging at L4-L5 effaces the anterior thecal sac and with bilateral facet hypertrophy mild to moderately narrow both neural foramina; grade 1 spondylolisthesis and disc bulging at L5-S1 severely narrow both neural foramina and impinge both exiting L5 nerve roots; bilateral L5 radiculopathy; diffuse degenerative disc disease with advanced disc space narrowing at L5-S1; and levoscoliosis. In late December 2013, Plaintiff had a follow-up with Dr. Kang. She reported that the prescribed medications had provided significant relief for her sleep issues and radicular right leg pain, but that she continued to experience neck tightness and shoulder pain. Physical examination findings were unchanged from the prior visit. Dr. Kang diagnosed cervical facet arthropathy, left shoulder pain, spondylolisthesis, and lumbar radiculopathy. He recommended that Plaintiff continue with her medications and physical therapy. If that treatment were not successful, Dr. Kang opined that Plaintiff would be a good candidate for cervical medial branch blocks and possibly lumbar transforaminal epidural steroid injections. (R. 461-71.)

In February 2014, State Agency reviewing consultants concurred on reconsideration with the initial opinion could frequently lift up to 10 pounds; occasionally lift up to 20 pounds; stand and/or walk for a total of 6 hours in an 8-hour day; sit with normal breaks for a total of 6 hours in an 8-hour day; could occasionally climb ramps or stairs; could occasionally crawl; and had no

handling, fingering, or feeling restrictions.  However, it was opined that Plaintiff could never (vs. occasionally) climb ladders, ropes, or scaffolds; could occasionally (vs. always) balance, stoop, kneel, or crouch; could frequently (vs. occasionally) reach overhead with either or both arms; and could always (vs. occasionally) reach in front or laterally.  (R. 96-107.)

In July 2014, Plaintiff was evaluated for bilateral medial foot nerve pain, bilateral hip pain, right shoulder pain, hand swelling and soreness, and blurry vision by Dr. Louisa Ziglar (rheumatologist).  Physical examination findings included:  normal gait; normal extremities with good motor tone and strength; 11/18 fibromyalgia tender points above and below waist line; no joint erythema, swelling, or range of motion deficits; bilateral trochanteric bursitis signs; and bilateral carpometacarpal tenderness.  Dr. Ziglar assessed that Plaintiff had MRI-confirmed lumbar and cervical spine disc disease and concurrently suffered from fibromyalgia and trochanteric bursitis.  Dr. Ziglar recommended that Plaintiff continue to take Flexeril and Lyrica and discontinue Amitriptyline to see if her blurry vision resolved.  Dr. Ziglar noted that Plaintiff did not want an injection for her trochanteric bursitis.  (R. 497-98.)  Also in July 2014, Dr. Ziglar completed a disability form for Plaintiff's private insurance carrier.  Dr. Ziglar opined that Plaintiff:  could lift and carry up to 10 pounds; could walk up to 15 minutes a day; could stand up to 15 minutes a day; could sit up to 20 minutes a day; and had no restrictions bending, kneeling, crouching, driving, or reaching.  (R. 481-82.)  In November 2014, Plaintiff returned to Dr. Ziglar.  Physical examination findings were the same as in July 2014, with the addition of bilateral metatarsophalangeal erythema.  Plaintiff reported that she continued to experience blurry vision and was awakened during the night by migraines.   Dr. Ziglar increased Plaintiff's Lyrica dosage. (R. 495-96.)  In February 2015, Plaintiff returned to Dr. Ziglar and reported continued blurry vision and worsening fibromyalgia symptoms.  Physical examination findings were the same as in

November 2014.  Dr. Ziglar discontinued Lyrica, increased Plaintiff's Flexeril dose, and prescribed Tramadol.  Dr. Ziglar's treatment notes indicate that Plaintiff wanted "to hold off" on injections for her trochanteric bursitis.  In March 2015, Plaintiff returned to Dr. Ziglar and reported normal vision.  Physical examination findings were the same as February, and Dr. Ziglar recommended that Plaintiff continue with Flexeril and Tramadol.  Dr. Ziglar again noted that Plaintiff wanted "to hold off" on injections for her trochanteric bursitis.  (R. 521-26.)

In May 2015, Plaintiff was evaluated by Dr. Irina Raklyar (rheumatologist).  Dr. Raklyar was a colleague of Dr. Ziglar and had assumed treatment for Dr. Ziglar's patients.  Plaintiff complained of finger, toe, shoulder, low back, and hip pain.  Physical examination findings included:  normal gait; normal extremities with good motor tone and strength; musculoskeletal multi tender points; upper, mid and lower back tenderness; bilateral trochanteric bursitis; and all joints cool, nontender, and nonswollen, with full range of motion.  Dr. Raklyar prescribed Ultracet and Cymbalta.  (R. 486-88.)  In July 2015, Plaintiff returned to Dr. Raklyar and reported that she was much improved overall but still experienced chronic pain in the left shoulder and noticed return of restless leg syndrome.  Physical examination findings included:  normal gait; normal extremities with good motor tone and strength; musculoskeletal "multi tender points – improved;" left shoulder tenderness at joint line, no swelling, full range of motion; bilateral trochanteric bursitis; and all joints cool, nontender, and nonswollen, with full range of motion.  Dr. Raklyar prescribed Gabapentin.  (R. 515-20.)  On August 28, 2015, Dr. Raklyar completed a Medical Assessment Of Ability To Do Work-Related Activities.  (R. 548-51.)  On September 8, 2015, Dr. Raklyar completed a Fibromyalgia/Chronic Fatigue Residual Functional Capacity Questionnaire.

(R. 552-57.)  Dr. Raklyar opined in both documents that Plaintiff was disabled.  The Court

describes Dr. Raklyar's opinions in greater detail in Section V.C.4. below.[5]

### 2.    Plaintiff's Function Report.

In August 2013, Plaintiff submitted a Function Report advising that she cared for her

husband and son.  (R. 184-91.)  Her typical daily activities included:  taking a shower; making

beds and straightening out around the house; doing laundry after her son carried it to the basement;

starting to cook dinner; napping; finishing dinner preparation; putting dishes in the dishwasher;

and resting.  She had trouble dressing if putting something over her head or lifting her arms; she

had trouble drying her hair and often required her daughter's assistance; and she need to hold on

to something to get in and out of the bathtub.  She could dust or sweep with a broom for about 30

minutes every other day.  She spent an hour or more preparing meals, but required help cutting

meats and vegetables.  She slept about 3 hours each night because of pains in her shoulder and

upper back.  She went outside every day and could go out alone.  She was able to drive but had

not driven much since she stopped working.  She shopped in stores once a week for about an hour

with her daughter's help.  She had coffee with friends once a week.  She used to be able to lift

heavy items, work on the computer, and sew/crochet.  She had problems lifting, walking, sitting,

standing, using her hands, and reaching.  She could not sit for long periods and could walk 1/2

block before needing to rest for 10-15 minutes.

### 3.    Lay Witness Letters.

On September 1, 2015, Vincent Roveccio wrote the following letter:

> I would like to give you a brief synopsis of what has been going on with my wife
> Dinorah Roveccio and her declining health.  My wife was always a hard working

---

[5] The record also contains physical therapy treatment notes from the period between March and May 2013 (R. 268-74); chiropractic treatment notes from August 2013 (R. 358-63); and physical therapy treatment notes from the period between January and March 2014 (R. 472-480).

person and has been working since before I met her in 1979.  She raised 2 kids while holding down a fulltime job, taking care of home[,] attending the kid[s'] games and other school or work related functions.  In the past few years she has been complaining constantly of back pain, neck pain and always feeling tired just to name a few.  It has now gotten to the point where my son and I have to do all the cooking, laundry and my daughter who has a family of her own comes to our house on the weekends to help us with cleaning the house.

(R. 240.)  On September 9, 2015, Jennifer Cusinato wrote the following letter:

I am the daughter to Dinorah Roveccio.  My mom has been sick for the last 2-3 years.  She has problems with dizziness from her vertigo, it takes her awhile to get up in the morning and start her day.  She also is in constant pain in her hands, back, shoulders, legs and hips.  She has problems sleeping at night and only gets about an hour of sleep at night.  I see her resting a lot during the day.  I have to help her do grocery shopping and help her with house chores and see her not going out as often as she use[d] to and social activities are becoming less often.

(R. 238.)  Neither letter is referenced in the ALJ's decision.[6]

## B.  **Hearing Testimony.**

Plaintiff was questioned by both her counsel and the ALJ during the September 2015

hearing.  (R. 39-66.)  The ALJ's decision summarized Plaintiff's testimony as follows:

At the hearing, she testified that she has carpal tunnel syndrome in her hands and fibromyalgia.  She can sit 15 minutes before she experiences pain; she can walk maybe one block; and she can lift less than 10 pounds.  She sees a rheumatologist monthly.  She has not had any emergency room visits.  She lives with her husband and adult son.  They cook and do household chores.  Her daughter helps too.  She testified that she could turn her neck 1/4 ways in both directions.  Up and down head motions are also a problem.  She has had physical therapy.  Epidural injections were recommended but not done.  She feels knife life pain under her shoulder blades.

The claimant testified that she rarely needs help dressing.  She rarely cooks, maybe once a week.  She has difficulty mopping and carrying laundry.  She often drops things and she has a computer but she does not use it as her hands "go numb."  She

---

[6] It was discovered during the hearing that the letters from Plaintiff's husband and daughter had been erroneously filed in an internal SSA file instead of the official exhibit file.  The ALJ accepted a hard copy of each letter and instructed his clerk to transfer the two letters to the exhibit file so they would be included in the record.  Neither letter was transferred before the ALJ issued his decision (R. 25-29), but both were transferred before the Appeals Council issued its decision (R. 5).  The letters are included as Exhibits 14E and 15E in the record made available to the Court.

has headaches 2-3 times a week.  She has vertigo and eye blurriness.  She has frequent low back and leg pain.

(R. 19-20.)  The Court notes Plaintiff's additional testimony that she was initially prescribed Lyrica for fibromyalgia but experienced side effects and switched to Cymbalta and Flexeril.  She was prescribed Neurontin/Oxycontin for restless leg syndrome and Tramadol for pain.  Oxycontin and Flexeril caused drowsiness that required her to nap at least twice a day.  Her insurance would not pay for the epidural injections and nerve blocks recommended by her doctors.  Shoulder pain made it painful for her to reach overhead or in any direction.  It was difficult to button a shirt and use zippers; she generally wore elastic pants and slip-on shoes.  She rarely drove; when she did, it was to a pharmacy around the block from her home.

Plaintiff's husband also testified during the hearing.  The ALJ's decision did not reference Mr. Roveccio's testimony (or the fact that Mr. Roveccio testified).  Plaintiff's brief accurately summarizes his testimony as follows:

> Mr. Roveccio, the Plaintiff's husband, testified that he and his son did all of the cooking, cleaning and shopping (Tr. 68).   An adult daughter came over on weekends to help with the cooking, cleaning and household chores (*Id.*).  He testified that the Plaintiff tried to help out, for example by wiping the toilet or around the bathroom, but that she was not successful (Tr. 69). He testified that she only drove when necessary during the day (when he was at work) such as to go to the local Walgreens to pick up her medications (*Id.*).  He testified that she did not go out more than once or twice per week because she tended to get dizzy from her hypertension, and lost her balance or fell when she got a dizzy spell (*Id.*).  He testified that she needed help cutting with a knife and fork (Tr. 70).  When the ALJ asked Mr. Roveccio why his wife stated that she made beds, he testified that the function report she completed was done immediately after leaving work, but the Plaintiff had been unable to make beds since then (*Id.*).  Mr. Roveccio testified that his wife would have liked to make beds and straighten up, but in reality, she did not (*Id.*).  Mr. Roveccio testified that he had observed her medical condition deteriorate (Tr. 71).  He testified that she did little functioning during the day and took naps (Tr. 71-72).

ECF No. 19 at 11 (citing R. 67-72).

As to the VE's hearing testimony, the ALJ's decision recounted:

> The vocational expert testified that [Plaintiff's past relevant work as an administrative assistant] is classified in the Dictionary of Occupational Titles as a work order clerk (DOT: 221.382-022), sedentary in exertion and semi-skilled, SVP: 3.  Based on the hypothetical residual functional capacity, the vocational expert testified that an individual could perform this work.

(R. 23.)

### C.    Submitted After Hearing But Before Decision.

The medical evidence in the record at the close of the hearing on September 17, 2015 consisted of Exhibits 1F-22F.  (R. 37.)  One exhibit was added to the record before the ALJ issued his decision:  Exhibit 23F (letter from Dr. Raklyar dated September 25, 2015 (R. 559)).  The Court describes this document in greater detail in Section V.C.4. below.

### D.    Submitted After Decision.

The ALJ issued his decision on October 19, 2015 when the medical evidence in the record consisted of Exhibits 1F-23F.  Three additional exhibits were subsequently added to the record:  Exhibit 24F (letter from Dr. Raklyar dated December 2, 2015 (R. 560)); Exhibit 25F (physiatric evaluation report dated January 21, 2016 from Dr. Priscilla D. Kaszubski (R. 561-66)); and Exhibit 26F (treatment notes from Dr. Raklyar dated June 28, 2016) (R. 567-75)).   The Appeals Council considered Exhibit 24F and concluded that that it did not provide a basis for changing the ALJ's decision.  (R. 2, 5.)  The Appeals Council decided that Exhibits 25F and 26F did not affect the ALJ's decision about whether Plaintiff was disabled beginning on or before October 19, 2015 because "[t]his new information is about a later time."  (R. 2.)  The Court describes these materials in greater detail in Section V.F. below.

## V.    DISCUSSION

### A.    Lay Witnesses.

Plaintiff contends that "automatic reversal and remand" is required under HALLEX I-2-1-20 because the letters from her husband and daughter were not included on the exhibit list attached to the ALJ's decision – even though the ALJ ordered their inclusion during the hearing. ECF No. 19 at 13-14; ECF No. 24 at 1-2.  Plaintiff's reliance on the Commissioner's Hearings, Appeals and Litigation Law Manual ("HALLEX") is misplaced.  HALLEX is a manual promulgating official Social Security policy and operating instructions that lacks "the force of law."  *Edelman v. Comm'r of Soc. Sec.*, 83 F.3d 68, 71 n.2 (3d Cir. 1996) (citing *Schweiker v. Hansen*, 450 U.S. 785, 789 (1981)); *see also Bordes v. Comm'r of Soc. Sec.*, 235 F. App'x 853, 854 (3d Cir. 2007).

Plaintiff also contends that the ALJ reversibly erred by failing to discuss the letters in the decision.  Although Plaintiff does not cite any legal authority for this argument, the Court notes the Third Circuit's instruction in *Burnett v. Commissioner of Social Security* that an ALJ is free to discount lay witness testimony but must explain the reasons for doing so even when such testimony mirrors the claimant's testimony.  *See id.*, 220 F.3d at 122 (explaining that duplicative lay witness testimony can bolster claimant's credibility).  However, since *Burnett* was decided, the Third Circuit has applied a harmless error rule in ruling on Social Security Appeals."  *Lopez v. Comm'r of Soc. Sec.*, No. 15-cv-3759 (KLM), 2016 WL 7468100, at *15 (D.N.J. Dec. 27, 2016) (citing *Rutherford v. Barnhart,* 399 F.3d 546, 553 (3d Cir. 2005)).  Courts in this Circuit have repeatedly found that an ALJ's failure to weigh lay statements, although technically a violation of applicable legal standards, did not require remand because the statements would not have changed the outcome of the case – especially where the testimony was cumulative.  *See*, *e.g.*, *Lopez*, 2016 WL 7468100, at *15 (because omitted lay testimony was substantially cumulative of claimant's

testimony, harmless error rule would have applied if remand not warranted on other grounds); *Buffington v. Comm'r of Soc. Sec.*, No. 12-cv-100 (JBS), 2013 WL 796311, at *9 (D.N.J. Mar. 4, 2013) (failure to assess lay testimony that is cumulative of Plaintiff's testimony not grounds for remand). The omitted lay testimony in this case is substantially cumulative of Plaintiff's testimony as to the cursory description of the same symptoms and daily activities. The Court therefore finds that any error by the ALJ regarding the letters from Plaintiff's husband and daughter was harmless.

### B.    Step Three.

The Step Three section of the ALJ's decision reads in its entirety:

> The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526). Sections 1.02 and 1.04 were considered. There is no evidence of loss of effective use of the upper or lower extremities and no clinical or diagnostic evidence of neurological deficits.

(R. 18.)[7] Plaintiff alleges that the ALJ committed three reversible errors at Step Three. First, Plaintiff argues that "[t]he ALJ's Step 3 discussion was two sentences long and provided no discussion or rationale as to why the ALJ reached the Step 3 decision." ECF No. 19 at 19. Second, Plaintiff argues that "[t]he ALJ's [m]edical evidence in record supports a finding that the Plaintiff's severe cervical and lumbar impairments meet or equal in combination Listing 1.04." *Id.* Third, Plaintiff argues that "Plaintiff's diagnosed fibromyalgia met the criteria of SSR 12-2p." *Id.* at 20 (citing Social Security Ruling 12-2p, *Titles II & XVI: Evaluation of Fibromyalgia*, 2012 WL 3104869 (S.S.A. Jul. 25, 2012)).

---

[7] The Court analyzes all Listing criteria, as did the ALJ, in effect on October 19, 2015, the date of the ALJ's decision. The applicable criteria are described in Social Security Administration Program Operations Manual System ("POMS") DI 34121.011, *Musculoskeletal Listings from 06/16/2008 to 09/28/2016*, available at http://policy.ssa.gov/poms.nsf/lnx/0434121011.

The Court rejects Plaintiff's first argument.  It is well-established in this Circuit that the ALJ need not "use particular language or adhere to a particular format in conducting analysis" so long as "the ALJ's decision, read as a whole, illustrates that the ALJ considered the appropriate factors in reaching the conclusion that [claimant] did not meet the requirements for any [L]isting." *Jones*, 364 F.3d at 505 ("the function of *Burnett* is to ensure that there is sufficient development of the record and explanation of findings to permit meaningful review").  Thus, the Court must determine whether the evidentiary discussion – regardless of its placement in the ALJ's decision – supports meaningful judicial review of the challenged Step Three finding(s) pursuant to the applicable legal standards.  *See Cosby v. Comm'r of Soc. Sec.*, 231 F. App'x 140, 146-47 (3d Cir. 2007).  The Court finds that the 4-page evidentiary discussion in the Step Four section of the ALJ's decision provides more than ample basis for reviewing the ALJ's findings as to Listing 1.04 and fibromyalgia.[8]  The Court addresses each finding below.

## 1. Listing 1.04.

Listing 1.04 requires:

Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord.  With:

A.      Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

---

[8] Plaintiff's brief does not mention Listing 1.02.  The Court finds that Plaintiff has waived any appeal of the ALJ's Step Three finding in this regard, or alternatively, that any error would be harmless.  *See Garrett v. Comm'r of Soc. Sec.*, 274 F. App'x 159, 162 (3d Cir. 2008) (affirming Step Three determination where claimant "provides us with no citations to any record evidence demonstrating that her impairments are of Listing-level severity"); *Domkos v. Colvin*, No. 15-cv-2660 (JLL), 2016 WL 1732380, at *3 (D.N.J. May 2, 2016) (noting that "[i]t is not enough to simply call foul and punt to this Court for research and analysis" when appealing Step Three finding).

OR

B.      Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;

        OR

C.      Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in an inability to ambulate effectively, as defined in 1.00 B2b.

POMS DI 34121.011.  Under Listing 1.00 B2b, "[i]neffective ambulation is defined generally as having insufficient lower extremity functioning (*see* 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of *both* upper extremities."  *Id*. (emphasis added).[9]  Defendant correctly concedes that Plaintiff satisfies the threshold Listing 1.04 requirement:  a disorder of the spine resulting in compromise of a nerve root (including the cauda equina) or the spinal cord.  *See* ECF No. 22 at 18.  The parties dispute whether Plaintiff satisfies the additional requirements of Paragraphs A, B, or C.

The ALJ's decision cited evidence of nerve root compression but did not cite any evidence that would satisfy the remaining requirements of Paragraph A.  Plaintiff argues that the ALJ erred by ignoring evidence that she "was found to have right-sided paraspinal muscle tenderness, decreased sensation in the right upper extremity, disc space narrowing, muscle spasm, reflex loss in the left lower extremity, muscle spasm in the upper and lower extremities, and limited range of motion."  ECF No. 19 at 20 (citing R. 257, 259, 261-63, 265, 382-84, 467, 472-80).  Defendant argues that the ALJ did not err because the medical evidence routinely documented Plaintiff's normal muscle strength, sensation, and reflexes with no neurological deficits.  *See* ECF No. 22 at

---

[9] Listing 1.00J requires an examination of the claimant's ability to ambulate without the assistive device(s) in place.  *See* POMS DI 34121.011.

18 (citing R. 257, 259, 261, 263, 463, 466-67, 484, 487, 490, 516, 567). That both parties offer many of the same record citations reflects the fatality in Plaintiff's argument – namely, that she did not *simultaneously* experience all the Paragraph A requirements.[10] As the Commissioner has explained for claims adjudicated outside the Fourth Circuit:

> [SSA] policy is that listing 1.04A specifies a level of severity that is only met when all of the medical criteria listed in paragraph A are simultaneously present: (1) Neuro-anatomic distribution of pain, (2) limitation of motion of the spine, (3) motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss, and, (4) if there is involvement of the lower back, positive straight-leg raising test (sitting and supine). Listing 1.04A uses the conjunction "and" when enumerating the medical criteria in order to establish that the entire set of criteria must be present at the same time on examination. When this set of criteria is present on examination, the individual has the clinical presentation we expect from a person who suffers from a nerve root compression that is so severe that it would preclude any gainful activity. 20 CFR 404.1525(a), 416.925(a). On the other hand, when the Listing criteria are scattered over time, wax and wane, or are present on one examination but absent on the other, the individual's nerve root compression would not rise to the level of severity required by Listing 1.04A.

Social Security Acquiescence Ruling 15-1(4), *Radford v. Colvin: Standard for Meeting the Listing for Disorders of the Spine with Evidence of Nerve Root Compression*, 80 Fed. Reg. 57418-02, 57420, 2015 WL 5564523 (F.R.) (Sep. 23, 2015). The ALJ's decision did not cite any evidence that would satisfy the additional requirements of Paragraph B (including no evidence of spinal arachnoiditis) or Paragraph C (including an inability to ambulate effectively). Plaintiff does not

---

[10] For example, Plaintiff and Defendant both rely on Dr. VanPelt's treatment notes from March 18, April 1, and April 15, 2013. On March 18, Dr. VanPelt reported: "On focal exam of the cervical spine there is right-sided paraspinal muscular tenderness. She has pain with forward flexion and extension of the spine. Upper motor strength, reflexes, and sensation are intact and equal bilaterally. There is a negative Spurling's. … There are no neurological deficits." (R. 263.) On April 1, Dr. VanPelt reported: "On focal exam of the cervical spine there is right-sided paraspinal muscular tenderness. She has pain with extension, flexion, rotation to the right. Upper motor strength, reflexes, and sensation are intact and equal bilaterally. Shoulder range of motion is full and strength is intact. … There are no neurological deficits." (R. 261.) On April 15, Dr. VanPelt reported: "There is right-sided paraspinal muscular tenderness. She [has] pain with forward flexion and extension of the cervical spine. Upper motor strength and reflexes are intact and equal bilaterally. There is decreased sensation to right upper arm." (R. 259.)

cite – nor can the Court identify – any such evidence overlooked by the ALJ.  The Court therefore finds that substantial evidence supported the ALJ's Step Three finding as to Listing 1.04.

### 2.    **Fibromyalgia.**

The purpose of Social Security Ruling 12-2p is to "provide[] guidance on how we develop evidence to establish that a person has a medically determinable impairment (MDI) of fibromyalgia (FM), and how we evaluate FM in disability claims and continuing disability reviews under titles II and XI of the Social Security Act (Act)."  SSR 12-2p, 2012 WL 3104869 at *1.  Plaintiff asserts that her "diagnosed fibromyalgia met the criteria of SSR 12-2p."  ECF No. 19 at 20; *see id*. at 14-15 (medical evidence "supported a finding that the Plaintiff met or equaled SSR 12-2p").  The Court agrees, as did the ALJ by finding at Step Two that Plaintiff's fibromyalgia was a severe impairment.  Since fibromyalgia is not a Listed impairment, the ALJ was required at Step Three to "determine whether [fibromyalgia] medically equals a listing (for example, listing 14.09D in the listing for inflammatory arthritis), or whether it medically equals a listing in combination with at least one other medically determinable impairment."  *Id*.  The ALJ's Step Three discussion did not cite Social Security Ruling 12-2p.  The Court finds no error in this omission, because "no rule or regulation requires the ALJ to specifically mention relevant Social Security Rulings when rendering a decision" and, in any event, the Ruling "makes clear that fibromyalgia is evaluated under the same well-established sequential evaluation process as all other impairments."  *Martinez v. Colvin*, No. 14-cv-1090 (MCC), 2015 WL 5781202, at *13 (M.D. Pa. Sep. 30, 2018) ("failure of citation to SSR 12-2 p, standing alone, would not compel a remand" at Step Three); *accord Linke v. Berryhill*, No. 17-cv-937 (DWA), 2018 WL 3574912, at *3 (W.D. Pa. Jul. 25, 2018) (same).  Nor does the Court find any error in the Court's finding that no combination of Plaintiff's impairments – thus including her fibromyalgia – medically equals the

severity of Listings 1.02 or 1.04.  As Judge Chesler eloquently explained in *Bush v. Commissioner*

*of Social Security*:

> This Court is not persuaded that the step three analysis was inadequate but, even if
> it was defective, Plaintiff has not even pointed to the Listing that [she] claims to
> have met or equaled, much less pointed to evidence of record that might have
> supported such a determination.  As such, Plaintiff has failed to persuade that any
> possible errors at step three materially harmed [her].  As in *Rutherford v. Barnhart,*
> 399 F.3d 546, 553 (3d Cir. 2005), "a remand is not required here because it would
> not affect the outcome of the case."

*Id.*, No. 14-cv-2086 (SRC), 2015 WL 3889543, at *2 (D.N.J. Jun. 25, 2015); *see Holloman v.*

*Comm'r of Soc. Sec.*, 639 F. App'x 810, 814 (3d Cir. 2016) (affirming Step Three finding where

claimant complained "in vague terms that certain impairments were not properly compared,

separately and in combination, to the listings" without identifying "specific avenues for meeting

or equaling specific listings that the ALJ should have considered but did not");  *Milano v. Comm'r*

*of Soc. Sec.*, 152 F. App'x 166, 169 (3d Cir. 2005) (affirming ALJ's finding where claimant "has

not attempted to show that her impairments meet or equal any specific Listing, and merely

concludes that she has 'severe medical conditions' that 'might' do so") (internal citation omitted));

The Court therefore finds that substantial evidence supports the ALJ's Step Three finding as to

Plaintiff's fibromyalgia.

### C.    Medical Opinions.

Plaintiff contends that the ALJ committed reversible error by improperly weighing the

medical opinions provided by Drs. Kang, Gonzalez, Ziglar, and Raklyar.  The Court reviews each

opinion below pursuant to the standards applicable to treating providers.  A treating opinion is

entitled to controlling weight if it "is well-supported by medically acceptable clinical and

laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the]

case record."  20 C.F.R. § 404.1527(c)(2); *see Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000)

("[A]n ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion.").  This deference applies to opinions that reflect judgments about the nature and severity of a claimant's impairment, including the claimant's symptoms, diagnosis and prognosis, what s/he can still do despite impairment, and his/her physical or mental restrictions.  20 CFR § 404.1527(a).  An "opinion" that a claimant is simply unable to work thus can never be given controlling weight because that is an administrative finding reserved to the Commissioner.  20 CFR § 404.1527(d).  When a treating opinion cannot be given controlling weight, it still may be entitled to some deference based on the ALJ's consideration of the following factors, which the ALJ must also consider as to non-treating and non-examining opinions:  length of treatment relationship, frequency of examination, nature and extent of the treatment relationship, relevant evidence used to support the opinion, consistency of the opinion with the entire record, and the expertise and specialized knowledge of the source.  20 C.F.R. § 404.1527(c)(2)-(6); *see Plummer*, 186 F.3d at 429 (ALJ "may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided").

### 1.    Dr. Kang.

Plaintiff asserts:

> Dr. Kang, [Plaintiff's] pain management physician, also limited her to less than sedentary work due to ongoing neck bilateral shoulder and arm pain with sharp, shooting numbness and pins and needles in the extremities (Tr. 461-471).  It was Dr. Kang's opinion that she could not perform full-time work, could not walk more than one block and could only sit or stand for 15 minute intervals (*Id*.).

ECF No. 19. at 16; ECF No. 24 at 3.  This grossly misstates the record.  Dr. Kang's treatment notes from the initial evaluation in December 2013 contain a section entitled, "History of Present

Illness." In that section, Dr. Kang reported Plaintiff's recitation of her medical history, including

her subjective complaints and the following subjective assessment of her functional abilities:

> Functionally, she is limited with full work like activity. She is limited with
> participating in recreational activity, physical exercise and household chores. She
> can only ambulate approximately one block before she has to stop because of her
> pain complaints. She can only sit for approximately 15 minutes before she has to
> get up and move about. She can only stand for approximately 15 minutes before
> she has to sit down. She occasionally has to lie down throughout the day to help
> alleviate some of her pain complaints.

(R. 465.) The ALJ's decision explained:

> In regard to back and lower extremity pain, particularly the right leg, the results of
> a lumbosacral MRI scan performed in December 2013 showed grade 1
> spondylolisthesis with narrowing causing compression at the L5 nerve root
> bilaterally. Dr. Kang, a pain management specialist[,] reported that the claimant
> had normal range of motion of the lumbosacral spine. There was evidence of
> multiple trigger points in the scapula and thoracic areas. There was no evidence of
> any neurological deficits. The claimant did complain of radiculopathy to the right
> leg but treatment records indicate that prescribed medication, which included
> Flexeril, Ultram and Lyrica, had provided a significant amount of relief with sleep
> and the right leg.

(R. 20.) The Court therefore finds no error as to Dr. Kang's opinion because he did not provide

one.

### 2.    Dr. Gonzalez.

Plaintiff asserts that Dr. Gonzalez opined that "Plaintiff was unable to sit for more than 15

minutes at a time or 2 hours in a day and was unable to lift or carry more than 10 lbs." ECF No.

19 at 16 (citing R. 381-402); ECF No. 24 at 3 (same). This is another gross misstatement of the

record. On June 18, July 12, and August 23, 2013, Dr. Gonzalez completed the same disability

form for Plaintiff's private insurer. Among other limitations, Dr. Gonzalez opined that Plaintiff

could not sit more than 4 hours; could not stand more than 4 hours; could never lift/carry any

weight in her right arm; and could frequently lift/carry up to 10 pounds with her left arm. (R. 388-

89, 400-02.) On August 27, 2013, Dr. Gonzalez completed a General Medical Report opining that

Plaintiff had unspecified limitations with lifting, pushing, and pulling but no limitations with sitting, standing or walking. (R. 385-87.) The ALJ ascribed "some weight" to these opinions because Dr. Gonzalez based her assessment "primarily on the claimant's allegations of pain" and did not "specialize in pain management, orthopedics, etc." (R. 22.) The decisional RFC limited Plaintiff to: sitting for no more than 6 hours and standing/walking no more than 4 hours in an 8-hour workday, and frequently lifting/carrying up to 10 pounds and occasionally up to 20 pounds. Based on Dr. Gonzalez's lack of expertise, nondescript treatment notes, and the other medical evidence in the record, the Court finds no error in the ALJ's rejection of Dr. Gonzalez's opinion that Plaintiff could only sit for 4 hours and could not lift/carry with her right arm. The Court therefore finds that the ALJ's assessment of Dr. Gonzalez's opinions is supported by substantial evidence.

### 3. Dr. Ziglar.

Plaintiff argues that the ALJ erroneously discounted Dr. Ziglar's opinion from a disability form completed on July 16, 2014 for Plaintiff's private insurance carrier. Dr. Ziglar reported that the primary diagnosis was fibromyalgia; the secondary diagnosis was back pain; current subjective symptoms were diffuse aches and fatigue; and that current physical examination finding was trochanteric bursitis. (R. 481.) Dr. Ziglar opined that Plaintiff: could lift and carry up to 10 pounds; could walk up to 15 minutes a day; could stand up to 15 minutes a day; sit up to 20 minutes a day; and had no restrictions bending, kneeling, crouching, driving, or reaching. (R. 482.)[11] The ALJ ascribed "some weight" to Dr. Ziglar's opinion "but not to the extent assessed, particularly in sitting, standing and walking" because of inconsistencies with the treatment records. (R. 22.) The

---

[11] Plaintiff's brief erroneously asserts that Dr. Ziglar limited Plaintiff to sitting for up to 2 minutes a day. *Compare* ECF No. 19 at 15 and R. 482.

Court finds no error in the ALJ's rejection of Dr. Ziglar's opinion on this basis. Although Dr. Ziglar noted on the form that she treated Plaintiff on March 27, April 10, and July 16, 2013, the earliest treatment notes in the record are from July 16 when Plaintiff complained of bilateral medial foot nerve pain, bilateral hip pain, right shoulder pain, hand swelling and soreness, and blurry vision. Physical examination findings on that date – the same date as Dr. Ziglar's opinion – included: normal gait; normal extremities with good motor tone and strength; no joint erythema, swelling, or range of motion deficits; 11/18 fibromyalgia tender points above and below waist line; bilateral trochanteric bursitis signs; and bilateral carpometacarpal tenderness. Dr. Ziglar noted that Plaintiff did not want an injection for her trochanteric bursitis. (R. 497-98.) The Court therefore finds that the ALJ's assessment of Dr. Ziglar's opinion is supported by substantial evidence.

### 4.    Dr. Raklyar.

Plaintiff also argues that the ALJ erroneously assessed the following three opinions provided by Dr. Raklyar:

- On August 28, 2015, Dr. Raklyar completed a Medical Assessment Of Ability To Do Work-Related Activities. She opined that in an 8-hour workday, Plaintiff could sit up to 3 hours, stand up to 1 hour, and walk up to 2 hours; would need to alternate sit/stand every 15-30 minutes; could occasionally lift/carry up to 10 pounds but never more; could use both legs and both hands for grasping, pushing/pulling, and fine manipulations; and needed to avoid temperature extremes. Dr. Raklyar also opined that Plaintiff "is disabled at this time." (R. 548-51.)

- On September 8, 2015, Dr. Raklyar completed a Fibromyalgia/Chronic Fatigue Residual Functional Capacity Questionnaire. She opined that Plaintiff could walk no more than 1 block; could continuously sit for more than 2 hours; could continuously stand for 30 minutes; could sit for a total of 2 hours in an 8-hour workday; could stand/walk for less than 2 hours total in an 8-hour workday; must be able to walk every hour for at least 5 minutes; must be able to shift at will between sitting and standing; would need unscheduled 15 minute breaks at least 5-times per day; and could lift/carry up to 10 occasionally but never more. Dr. Raklyar also opined that during an 8-hour workday, Plaintiff: could spend up to 4 hours doing bilateral grasping, turning, and twisting objects with her hands; could never reach with her left arm and could spend up to 4 hours reaching with her right arm; could spend up to 4 hours bending or twisting at the waist; and had no

limitations in fine manipulations with her fingers.  Dr. Raklyar further opined that Plaintiff was disabled since March 19, 2013.  (R. 552-57.)

• On September 25, 2015, Dr. Raklyar wrote a letter stating that she had replaced Dr. Ziglar, who treated Plaintiff from March 2013 to May 2015.  Dr. Raklyar opined: "Due to the nature of her illness, [Plaintiff] is unable to work at her previous employment as an administrative assistant.  Her arm and hand symptoms in particular (paresthesias; weakness and dropping items; trouble with fingering, handling and reaching; hand cramping) make computer typing, document handling and other secretarial work extremely difficult, and painful as well.  The pain associated with her symptoms would most certainly interfere with her work abilities."  (R. 559.)

The ALJ discounted Dr. Raklyar's opinions as follows:

> I accord these assessments some weight due to the claimant's diagnoses of cervical and lumbosacral degenerative disc disease and fibromyalgia, but I do not concur with the extent of the functional limitations assessed.  For instance, limitations in sitting, stand/walking are not consistent with treating records which show only mild restrictions or full range of motion in the spine and no evidence of neurological deficits in the lower extremities.  In regard to the upper extremities, there is no evidence of neurological deficits, carpal tunnel syndrome or shoulder pathology.  Further it is noted that Dr. Raklyar initially, in August 2015, assessed no limitations in repetitive grasping, fine manipulation but in September 2015, it was indicated that the claimant drops things and has difficulty fingering, handling and reaching.  The evidence does not establish any limitations in fine fingering or handling other than subjective complaints of pain.  The claimant's daily activities such as driving, doing light chores, grocery shopping, etc. (Exhibit 2E) indicate that she is able to handle most daily activities independently.  There is no objective evidence of manipulative limitations.

(R. 21-22.)

The Court finds as a threshold matter that Dr. Raklyar's views that Plaintiff is disabled and unable to work as an administrative assistant are not controlling under the treating provider rule.  These opinions address a subject matter that is exclusively within the ALJ's purview.  The Court also finds no error in the ALJ's rejection of Dr. Raklyar's opinions as inconsistent with the treatment records.  Dr. Ziglar's treatment notes for November 2014, February 2015, and March 2015 reflect the same physical findings as in July 2014 when Dr. Ziglar offered her opinion.  As discussed above, that evidence did not support Dr. Ziglar's opined sitting/standing/walking

limitations, which were less restrictive than Dr. Raklyar.  Notably, Dr. Ziglar's opinion did not identify any functional limitations involving Plaintiff's shoulders, arms, or hands involving reaching, pushing/pulling, grasping, twisting, turning, or fine manipulations.  Physical examination findings from Dr. Raklyar's first evaluation of Plaintiff in May 2015 included: normal gait; normal extremities with good motor tone and strength; musculoskeletal multi tender points; upper, mid and lower back tenderness; bilateral trochanteric bursitis; and all joints cool, nontender, and nonswollen, with full range of motion.  In July 2015, during a second evaluation by Dr. Raklyar, Plaintiff reported that she was much improved overall but still experienced some pain.  Physical examination findings at that time included:  normal gait; normal extremities with good motor tone and strength; musculoskeletal "multi tender points – improved;" left shoulder tenderness at joint line but no swelling and full range of motion; bilateral trochanteric bursitis; and all joints cool, nontender, and nonswollen, with full range of motion.  (R. 516.)  There were no additional treatment notes from Dr. Raklyar in the record before the ALJ that would support Dr. Raklyar's initial opinion, let alone the increasingly restrictive limitations in her subsequent two opinions.  However, the Court is troubled that this section of the ALJ's opinion references a finding that Plaintiff "is able to handle most daily activities independently."  (R. 22.)  This finding rested entirely on Plaintiff's August 2013 Function Report (see id. (citing Exhibit 2E [R. 184-91]) and did not address conflicting evidence from Plaintiff's hearing testimony – and her husband's hearing testimony – that, among other things, she rarely drives, is no longer able to do housework, and is no longer able to shop by herself.  Since it is unclear how extensively the ALJ's assessment of Dr. Raklyar's opinions relied on the independence finding, the Court cannot meaningfully review this aspect of the ALJ's decision.  The Court therefore finds that remand is warranted as to assessment of Dr. Raklyar's opinions.

### D.    Plaintiff's Subjective Symptoms.

"Credibility determinations as to a claimant's testimony, regarding pain and other subjective complaints are for the ALJ to make." *Malloy v. Comm'r of Soc. Sec.*, 306 F. App'x 761, 765 (3d Cir. 2009) (citing *Van Horn v. Schweiker*, 717 F.2d 871, 873 (3d Cir. 1983)).  The ALJ is required to assess the credibility of a claimant's subjective complaints using a two-step process. *See* 20 C.F.R. § 416.929.  First, the ALJ must determine whether the record demonstrates that the claimant possesses a medically determinable impairment that could reasonably produce the alleged symptoms.  Second, the ALJ must assess the credibility of the claimant's complaints regarding the intensity of the symptoms.  To do this, the ALJ must determine if objective medical evidence alone supports the claimant's complaints; if not, the ALJ must consider other factors, including: (1) the claimant's daily activities; (2) the location, duration, frequency and intensity of the claimant's pain; (3) any precipitating or aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken by claimant to alleviate the pain; (5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms, (6) any other measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.  The ALJ's "determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  Social Security Ruling 96-7p, *Policy Interpretation Ruling Titles II & XVI:  Evaluation of Symptoms in*

*Disability Claims:  Assessing the Credibility of an Individual's Statements*, 1996 WL 374186, at

\*4 (S.S.A. Jul. 2, 1996).[12]

After noting that Plaintiff's subjective symptoms were considered in accordance with the

requirements of Social Security Ruling 96-7p, the ALJ recited the two-step standard above and

concluded that her "statements concerning the intensity, persistence and limiting effects of these

symptoms are not entirely credible for the reasons explained in this decision."  (R. 19-20.)  The

Court identifies two errors in the ALJ's assessment.

First, it is unclear how extensively the ALJ relied on his observations that Plaintiff's

"complaints of pain have been conservatively treated" and that "the claimant has chosen not to

proceed" with epidural block injections and trigger point injections recommended by her treating

providers.  (R. 21.)  Social Security Ruling 96-7p provides:

> [T]he individual's statements may be less credible if the level or frequency of
> treatment is inconsistent with the level of complaints, or if the medical reports or
> records show that the individual is not following the treatment as prescribed and
> there are no good reasons for this failure.  However, the adjudicator must not draw
> any inferences about an individual's symptoms and their functional effects from a
> failure to seek or pursue regular medical treatment without first considering any
> explanations that the individual may provide, or other information in the case
> record, that may explain infrequent or irregular medical visits or failure to seek
> medical treatment.

1996 WL 374186, at \*7.  Such explanations include that the "individual may not be able to afford

treatment and may not have access to free or low-cost medical services."  *Id*.  Plaintiff testified

that she was covered by her husband's private insurance and that she rejected the injections

because the insurer would not cover them.  The ALJ's decision omitted this explanation.  The ALJ

also failed to question Plaintiff about whether she would be charged for treatment at reasonably

---

[12] Social Security Ruling 96-7p applies to SSA decisions that, like the ALJ decision in this case, were made
prior to March 28, 2016.

proximate hospitals, whether such costs were the reason Plaintiff did not seek emergency room treatment, and whether Plaintiff had reasonable access to low cost clinics or other medical services. *See Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 547 (3d Cir. 2003) (claimant's inability to afford treatment adequately explained failure to seek it); *Vaneman v. Comm'r of Soc. Sec.*, No. 04 cv-4687 (JBS), 2009 WL 2143649, at *11 (D.N.J. July 14, 2009) ("The ALJ erred by concluding that Plaintiffs description of her disabling pain lacks credibility because he failed to consider Plaintiff's claimed inability to afford treatment."; *Torres v. Comm'r of Soc. Sec.*, No. 15-cv-6344 (ES), 2016 WL 5339724, at *5 (D.N.J. Sept. 23, 2016) ("failure to consider [claimant's] ability to afford medical treatment constitute[d] error warranting remand" where "ALJ's credibility determination had a significant impact on the RFC analysis"); *Figueroa v. Comm'r of Soc. Sec.*, No. 17-cv-8239 (JLL), 2018 WL 6918869, at *5 (D.N.J. Dec. 28, 2018) (collecting cases).

Second, the ALJ's decision described Plaintiff's daily living activities from her August 2013 Function Report and September 2015 hearing testimony – but omitted the hearing testimony of Plaintiff's husband, who was questioned extensively by the ALJ about Plaintiff's functional abilities over this 2-year period and testified to a marked decline. It is unclear as a result whether the ALJ's assessment of Plaintiff's symptoms covered the entire period or a subset.

The Court therefore finds that remand is warranted because the ALJ's assessment of Plaintiff's subjective symptoms is not supported by substantial evidence.

### E.    Step Four.

Plaintiff contends that the ALJ's dual Step Four findings – the RFC finding and the finding that Plaintiff could perform her past relevant work – are not supported by substantial evidence. The Court need not address either argument at this time because the ALJ must render new Step

Four findings on remand after reassessing Dr. Raklyar's opinions and Plaintiff's subjective symptoms.

### F.    **Additional Evidence.**

"[A] district court 'cannot look to evidence never presented to the ALJ in determining whether that decision was supported by substantial evidence[.]'" *Miller v. Comm'r Soc. Sec.*, 732 F. App'x 162, 165 (3d Cir. 2018) (quotation omitted); *see Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001) ("The correctness of [the ALJ's] decision depends on the evidence that was before him.  He cannot be faulted for having failed to weigh evidence never presented to him.").  When a claimant seeks to rely on evidence that was not presented to the ALJ, a district court may remand the case under Sentence Six of 42 U.S.C. § 405(g) if the claimant can demonstrate that (1) the evidence is new, (2) good cause exists for not presenting the evidence to the ALJ in a timely manner, and (3) the evidence is material.  *See Matthews*, 239 F.3d at 592-92; *Strelec v. Colvin*, No. 5-cv-3010 (JLL), 2016 WL 2736103, at *8 (D.N.J. May 11, 2016).  The claimant bears the burden of demonstrating that all three elements are satisfied.  *See Szubak v. Sec'y of Health and Human Servs.*, 745 F.2d 831, 833 (3d Cir. 1984).  Plaintiff contends that remand is required for the ALJ to consider three categories of additional evidence:

- Exhibit 24F is a letter from Dr. Raklyar dated December 2, 2015 that is identical to her letter dated September 25, 2015 (Exhibit 23F (R. 559)), except for the notation that a "[w]orkup is in progress for suspected carpal tunnel syndrome; she has been referred for nerve conduction velocity testing."  (R. 560.)

- Exhibit 25F is a physiatric evaluation report dated January 21, 2016 from Dr. Priscilla D. Kaszubski (physical medicine and rehabilitation).  (R. 561-66.)  Dr. Kaszubski observed that Plaintiff appeared slightly uncomfortable.  Physical examination findings included:  diminished pinprick in the median nerve distributions of both hands; slight difficulty with right greater than left heel walking; range of lumbar spine motion within functional limits; range of cervical spine motion slightly limited in rotation; and some sensory deficits and weakness in the right ankle.  Dr. Kaszubski opined that Plaintiff's December 2013 lumbosacral spine MRI revealed disk bulging with narrowing at L5-S1.  She also

opined that Plaintiff's April 2013 cervical spine MRI revealed:  a herniated disk at C3-C4 and C4-C5; herniated disk osteophytic ridge complex in C5-C6 and C6-C7; prominent narrowing of the right C6-C7 neural foramen; and mild central stenosis.  An electrodiagnostic study revealed "evidence of bilateral median nerve entrapments at the wrist (carpal tunnel syndrome) of a mild severity; no evidence for peripheral neuropathy; no evidence for cervical or lumbar radiculopathy; no evidence for lower extremity nerve entrapment."  Dr. Kaszubski prescribed bilateral cock-up splints.

- Exhibit 26F consists of treatment records from Dr. Raklyar for Plaintiff's June 28, 2016 appointment.  (R. 567-75.)

The Court finds that remand is warranted for Exhibit 25F but not Exhibits 24F and 26F.

Defendant does not dispute (*see* ECF No. 22 at 23-24), and the Court agrees, that Exhibit 25F – Dr. Kaszubski's January 2016 report, including nerve conduction study results – satisfies the first two requirements for a Sentence Six remand.  The evidence is new because it was not previously entered into evidence and is not merely cumulative of what is already in the record.  *See Szubak*, 745 F.2d at  833.  Plaintiff's assertion that her private insurance carrier refused to pay earlier for the nerve conduction study constitutes good cause for failing to enter it into evidence before the ALJ's decision was rendered in October 2015.  The Court also finds that Exhibit 25F is material.  The evidence "relate[s] to the time period for which benefits were denied" (i.e., June 13, 2013 through October 19, 2015) both because Plaintiff's treating providers opined as to her carpel tunnel syndrome during that period, and because she complained about related symptoms during that period.  Moreover, "it cannot be said that there is no possibility that [Dr. Kaszubski's report] would have changed the outcome of the [ALJ's] decision."  *Id*.; *see Newhouse v. Heckler*, 753 F.2d 283, 287 (3d Cir. 1985) (materiality standard for new evidence on Sentence Six remand is "not great" and need not satisfy preponderance test).  The ALJ stressed during the hearing the importance of "find[ing] where the carpal tunnel syndrome was diagnosed" (R. 43) and noted in his decision the absence of any diagnostic evidence of carpal tunnel syndrome (R. 20).  Dr.

Kaszubski is a physician who practices in a specialized field and her report, diagnostic test results, and prescription of bilateral wrist braces corroborate many of Plaintiff's subjective symptoms and alleged functional limitations. Such evidence is plainly "probative of [Plaintiff's] disability status" and should be considered on remand. *Gross v. Comm'r of Soc. Sec.*, 653 F. App'x 116, 122 (3d Cir. 2016). In contrast, Exhibits 24F – Dr. Raklyar's December 2015 letter – is neither new nor material. The letter merely restates her opinions (based on the same record medical evidence) that Plaintiff is disabled and unable to work as an administrative assistant; as previously noted, these subjects are exclusively within the ALJ's purview. Exhibit 26F – Dr. Raklyar's June 2016 treatment notes – is not material because it relates to Plaintiff's condition nearly nearly nine months after the period for which benefits were denied.

## VI.    CONCLUSION

The Court cannot conclude at this time that substantial evidence supports a finding that Plaintiff is disabled. For the reasons explained in this Opinion, the Court reverses the ALJ's decision that Plaintiff was not disabled and remands the case to the Commissioner pursuant to Sentences Four and Six of 42 U.S.C. § 405(g) for further proceedings in accordance with the preceding instructions and the accompanying Order. *See Gross*, 653 F. App'x at 122 (ordering further proceedings consistent with opinion finding remand warranted under Sentences Four and Six).


Dated: March 13, 2019                          s/ Paul A. Zoss
At Newark, New Jersey                     PAUL A. ZOSS, U.S.M.J.